Filed 5/30/25  In re E.V. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re E.V., a Person Coming Under the Juvenile Court Law. | B339231 (Los Angeles County Super. Ct. No. 24CCJP01171A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. D.V., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Mary E. Kelly, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Bryan Mercke, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, D.V. (mother) challenges the juvenile court's order removing her six-month-old son E.V. (son) from her custody and care. Mother argues substantial evidence does not support the court's removal order. We find no error and affirm.

## BACKGROUND

### 1. The Family

Mother met son's father F.H. (father) in February 2023. Soon after, mother became pregnant with son and moved in with father. Mother and father lived together on and off and had a tumultuous relationship. After their first four months living together, mother and father had a fight and father obtained a "TRO." Mother moved in with her mother (maternal grandmother). Sometime later, father also moved in with maternal grandmother. After a few months, maternal grandmother "kicked [father] out because he disrespected her." Mother moved out with father, and they rented a garage. In January 2024,[1] mother and father became engaged. When the underlying proceedings began, mother and father had been living together in an apartment with son for a few months. Father was

_____

[1] Unless otherwise noted, all referenced dates are in the year 2024.

2

26 years old, mother was 19 years old, and son was three months old. Neither mother nor father has any other children.

## 2. Events Preceding Petition

On April 4, mother and father had an argument that turned physical. Mother was sitting on the couch at their apartment, holding son. She and father were arguing when father slapped mother's head and, accidentally, also hit son's head, causing son to cry. Mother did not believe father purposely hit son. Father denied hitting son. Son was not injured. Mother put son in the bedroom, then returned and hit father "all over his body." Mother asked father to leave, which he did. After hearing screaming and banging coming from mother and father's apartment, the apartment manager was concerned for son's safety and called the police. Father also called law enforcement before leaving.

The April 4 incident generated a referral to the Los Angeles County Department of Children and Family Services (Department). Mother told a Department social worker she planned to move herself and son in with maternal grandmother until she could begin working and living on her own. Mother stated she had not worked since getting pregnant because father wanted her "to be a stay at home wife." Mother said father was unfaithful to her. Mother also said that, on five or six occasions, father had kicked her out of their shared living arrangements and thrown her belongings onto the street. She said father previously had hit her, "backhanded" her on her face, punched her arm, strangled her, and sexually assaulted her, sometimes when son was present and when she was pregnant with son. When mother was pregnant, father was arrested after he pinned her against a wall and choked her. Mother said she usually

3

defended herself by kicking father in the groin.  Nonetheless, mother denied feeling unsafe around father.

Mother reported keeping son up to date on his doctor's appointments and immunizations, as well as providing food and toys for him.  Mother said father was not involved in son's care, did not want to interact with him, and only wanted to hold son when he (father) was drunk.  Nonetheless, father bought whatever son needed.

Mother told the social worker she drank alcohol and her drink of choice was Hennessy.  She said she drank every other day before becoming pregnant, but did not drink while pregnant. Since son was born, mother reported drinking again, but "denied alcohol challenges."  Mother also reported smoking marijuana (but not very often), using cocaine (but not since being pregnant), and having a Xanax addiction in high school (but had not used in the past two years).  Mother previously had participated in substance abuse counseling and anger management classes.

Mother believed father had a drinking problem.  She said father was "an aggressive drunk" and had been "arrested for DUIs multiple times."  She said father tried to drink and drive with son, but mother did not allow him to do so.

The Department social worker also spoke with father. Father stated he was "the provider for the family."  He did not want mother to work and did not give her money or keys to their apartment.  He said he was able to buy whatever she needed, even in an emergency.  Father said he helped care for son, but mother was son's primary caregiver.  Father reported having a good relationship with mother.  He said they had future plans and wanted to stay together.  Besides the April 4 incident, father denied domestic violence with mother or anyone.  As to the

4

April 4 incident, although father admitted hitting mother, he stated mother hit him first.  Father reported "DUIs from 2021 and 2022," stating he had completed his classes and community service.  He said he no longer drank alcohol.  A "CLETS" search for father revealed five arrests (and two convictions) for driving under the influence between 2021 and 2023.

With help from the social worker, mother and father agreed to a temporary safety plan.  Mother and son planned to stay with mother's friend V.C., with whom mother often stayed when she and father had a fight.  Mother and father repeatedly indicated they wanted to continue their relationship and asked if they could resume their relationship after the safety plan ended.

The social worker also spoke with maternal grandmother, with whom mother and father previously had lived for approximately four months.  Maternal grandmother stated father was " 'violent' " and "was always mad over everything."  She heard him "screaming and cussing at mother."  There were nights when maternal grandmother could not sleep because mother and father were yelling at each other.  Maternal grandmother told the social worker father was often drunk and "was more verbally aggressive when he was drinking."  She was concerned father forced mother to be intimate with him.  Maternal grandmother said father did not give mother money, did not leave her with food or necessary items for son, and did not care for son.

The social worker also spoke with paternal grandmother and a paternal aunt.  Both reported mother and father often had verbal and physical altercations.  Similarly, both reported father had multiple DUI arrests.  Paternal grandmother was concerned for son because of his young age and because mother and father

5

"just do not get along." The paternal aunt described mother and father's relationship as " 'toxic.' "

On April 11, the Department requested an expedited removal of son from mother and father. The juvenile court granted the removal order as to father only. Son remained in mother's care.

In its detention report filed a few days later, the Department stated father showed "no accountability or insight as to his actions" and mother "lacks understanding and insight as to how her tumultuous relationship with the father, which includes ongoing intimate partner violence, places their infant child at risk of physical and emotional harm." The Department reported mother was hesitant to leave father and asked if she could continue to see father.

On April 14, mother and three friends broke into father's apartment. They physically assaulted father and two females, smashed an apartment window, and broke the windows of father's friend's car. Mother and her friends were gone by the time law enforcement arrived. Father and one of his friends were injured, but both refused medical treatment. At the time, father was "heavily intoxicated" and unable to give a statement other than to say he had been in a fight and believed he had been shot. Father had not been shot. A restraining order was entered protecting father from mother. Son was not present during the April 14 incident.

3. **Petition**

On April 15, the Department filed a four-count Welfare and Institutions Code section 300 petition on behalf of son (petition).[2]

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

6

The petition alleged son was at risk due to mother and father's history of domestic violence, mother's failure to protect son from the domestic violence, mother's history of and current substance abuse and father's failure to protect, and father's history of and current substance abuse and mother's failure to protect.

The initial hearing on the petition was held at the end of April. That day, the Department reported mother and father appeared to want to reconcile and move back in together. At some point, mother and son had moved in with maternal grandmother. However, maternal grandmother reported mother left with son for one week and she did not know where they were. The Department was concerned both that, despite the Department's involvement, mother had engaged in domestic violence with father (on April 14) and that both mother and father continued to lack insight into their actions. Based on mother's aggressive behavior and continued lack of insight, the Department asked the juvenile court to remove son from mother.

At the initial hearing, counsel for mother asked the court not to detain son from mother. Counsel disputed the description of the April 14 incident. Noting father had been intoxicated, counsel urged the juvenile court "not to give any weight to father's statement or report of this event." Counsel also noted mother was residing with maternal grandmother, who was able to help care for son. On the other hand, counsel for the Department and counsel for son argued the court should detain son from both mother and father.

After hearing argument, the juvenile court detained son from mother and father and ordered monitored visitation. The court also entered a "stay away" order, stating there was "to be

7

no contact between mother and father." Son was placed with maternal grandmother.

### 4.    Continued Investigation

In May, a Department social worker again spoke with mother. Mother reiterated what she previously had reported. Additionally, mother stated she only hit father in self-defense. She never hit father first. She said they often argued but April was the first time father hurt her. She denied father forced her to be intimate with him without her consent. Mother also denied any current substance abuse problems.

The social worker also again spoke with father. He denied many of the allegations against him. He stated mother "gets aggressive and she hits me and I grab her to stop hitting me and I tell her to calm down and to stop." He denied hitting mother, strangling mother, or forcing mother to have sex. He said he never accidentally hit son. He stated, "All [mother] wants me to do is look like a bad guy." Father stated the last time he drank alcohol was less than two weeks earlier, on his birthday. He denied being drunk in front of son and said, "The alcohol does not control me." Father told the social worker he previously had participated in a drug and alcohol program, but he could not remember the name of the agency. Since son had been removed from father, father had missed three drug tests and once tested negative for substances. Father wanted " 'to try and work it out with [mother] and for the baby.' "

In its May adjudication and disposition report, the Department expressed concerns for son's safety in the care of mother and father. As support for its concerns, the Department pointed to mother and father's "ongoing and history of substance abuse" and their "violent behavior." The Department believed

8

mother and father had "unresolved issues of domestic violence," with both demonstrating behaviors of an aggressor. Additionally, the Department stated neither mother nor father had demonstrated an ability to stay sober. Especially in light of son's very young age, the Department recommended the juvenile court sustain the petition and order reunification services.

In June, the Department reported maternal grandmother monitored mother's visits with son, which were going well. By July, however, the Department reported mother was not visiting consistently. Mother also was not drug testing consistently. Between April and July, mother missed seven of nine drug tests and tested positive for marijuana twice, including at her most recent test conducted in early July. Mother had not enrolled in services to address her substance use.

**5.  Adjudication and Disposition**

The combined jurisdiction and disposition hearing was held on July 10. At the hearing, counsel for mother argued mother was the victim of father's violence, her substance abuse was remote in time, her current drug use did not put son at risk, and she did not fail to protect son. Counsel asked the court to return son to mother's care under a safety plan requiring mother to live with maternal grandmother. Counsel argued there was no clear and convincing evidence of risk to son, who already was placed with maternal grandmother. Counsel noted mother was 19 years old, son was an infant who needed his mother, and mother had not had contact with father for more than two months. Counsel for father noted father "vehemently denies" the allegations of the petition as they pertained to him. Father claimed mother was the aggressor and his substance abuse was all in the past. Counsel for son argued the juvenile court should strike the

9

allegations of sexual abuse by father, as well as reference to certain drug use by mother, but otherwise sustain the petition and remove son from both mother and father. Counsel noted mother was not drug testing and was not consistently visiting son. Finally, counsel for the Department asked the juvenile court to sustain the petition as plead and remove son from both mother and father. Counsel noted mother and father "continually asked if they could resume their relationship and continue living together," "lacked insight," and were not focused on their child. Counsel believed it was "premature to allow the mother to live in the maternal grandmother's home."

After hearing argument, the juvenile court amended the petition by deleting references to father's alleged sexual abuse of mother as well as father's alleged history of cocaine use. The court sustained the petition as amended. The court declared son a dependent of the court under subdivisions (a) and (b) of section 300 and ordered him removed from mother's and father's custody and care. The court adopted the arguments made by counsel for the Department and counsel for son.

The court ordered mother to enroll in a drug and alcohol program with after care, submit to drug testing, participate in a 12-step program, attend a domestic violence program for aggressors and victims, to participate in a parenting program, and to participate in individual counseling. Mother was granted monitored visitation. The Department was authorized to liberalize her visits.

**6. Appeal**

Mother appealed the juvenile court's July 10 order.

10

Father also appealed the court's July 10 order.  We dismissed father's appeal in accordance with *In re Phoenix H.* (2009) 47 Cal.4th 835.

## DISCUSSION

### 1.    Applicable Law and Standard of Review

When a child has been adjudged a dependent child within the meaning of section 300, the juvenile court "may limit the control to be exercised over the dependent child by any parent" if necessary to protect the child.  (§ 361, subd. (a)(1).)  Section 361, subdivision (c)(1) permits the juvenile court to order a child removed from his or her parent if the court finds by clear and convincing evidence that the child is, or would be, at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal.  " ' "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child." ' "  (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, disapproved on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 (*O.B.*).)  In making its determination, the juvenile court may consider the parent's past conduct as well as present circumstances.  (*In re A.S.*, at p. 247.)

We review the juvenile court's removal order under the substantial evidence standard of review, bearing in mind the heightened burden of proof by clear and convincing evidence.  (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re A.F.* (2016) 3 Cal.App.5th 283, 292; *O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012; see *In re V.L.* (2020) 54 Cal.App.5th 147, 155 ["*O.B.* is controlling in dependency cases"].)

11

## 2. Substantial evidence supports the juvenile court's removal order.

Mother challenges only the juvenile court's order removing son from her custody and care. Mother argues substantial evidence does not support the removal order and, instead, the juvenile court should have ordered mother and son to live with maternal grandmother with family maintenance services in place. We disagree.

As mother does not challenge the juvenile court's jurisdictional findings, it is undisputed mother and father's relationship was violent and volatile. Mother and father engaged in violent altercations while mother was pregnant as well as in son's presence after his birth. Indeed, when he was only three months old, son was struck during one such altercation. Even Department involvement did not stop the violence between the parents. After the parents' domestic violence triggered the Department's involvement and mother and son had moved out of the family apartment, mother returned to the apartment with friends and violently attacked father and his friends.

Mother demonstrated neither insight into nor an ability to leave her relationship with father. Throughout most of the underlying proceedings, mother and father indicated they wanted to reunite and had plans for their future. This was consistent with their pattern of breaking up, then reconciling. Despite all their volatility, mother denied feeling unsafe around father. During the Department's investigation, mother stated father hurt her for the first time in April, when months earlier father had been arrested for physically assaulting her when she was pregnant. "[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future

12

without court supervision." (*In re A.F.*, *supra*, 3 Cal.App.5th at p. 293.)  "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)

It is similarly undisputed mother had unresolved substance abuse issues.  Although mother had indicated a willingness to engage in services and drug test for the Department, mother had not enrolled in any services and had missed most of her drug tests.  When she did test, she tested positive for marijuana, including just days before the adjudication

Mother argues the juvenile court should have placed son with her and ordered them to live with maternal grandmother under Department supervision.  It was reasonable, however, for the juvenile court to reject such a proposal.  After the underlying proceedings had begun and mother and son were living with maternal grandmother, mother disappeared with son for one week.  Maternal grandmother did not know where they were.  This supports a finding that placing son with mother at maternal grandmother's home was not a safe alternative to removal.  Similarly, although mother states maternal grandmother was "her first and primary support person," the record reveals mother also had support in her friend V.C., with whom mother often stayed after fighting with father.  Indeed, V.C. opened her home to mother and son during the underlying proceedings when mother and father made a safety plan following their April 4 altercation.

Finally, in addition to the parents' "toxic" and violent relationship and their unresolved substance abuse issues, son was very young.  After only three months of life, father struck son (albeit accidentally) while fighting with mother.  By the time of the adjudication, son was six months old—i.e., still an infant and

13

still very vulnerable. At that time, mother had shown neither an ability to understand or break her cycle of violence with father nor an ability to stay free of substances.

In light of the entire record, it was not unreasonable for the juvenile court to reject mother's preferred plan of living with son at maternal grandmother's home under Department supervision. Although maternal grandmother certainly provided support for mother, the court could not overlook the unfortunate and perilous situation in which mother had placed son. On this record, and bearing in mind the applicable clear and convincing standard below, we conclude substantial evidence supports the removal order.

## DISPOSITION

The juvenile court's July 10, 2024 order is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


CHAVEZ, J.


RICHARDSON, J.

14